McDANIEL v. ANDERSON.

1. An instrument under seal was signed by certain children of one A., whereby they jointly and severally agreed to account, at the death of said A., at a new valuation, presently to be made, for lands previously received by them, and to pay to A.'s executors whatever sums might be necessary to equalize all of A.'s children. *Held*, from the terms of the paper, itself, and from parol evidence, to be inoperative because not signed by all of A.'s children, who had received lands from their father.
2. A deed of conveyance, signed, sealed and recorded, will be considered as delivered, there being nothing to the contrary, except the absence of the conveyee at the time.
3. Parties who have received the proceeds of land sold for partition as the property of their deceased brother, cannot deny his title to such land.
4. A finding of fact by the Circuit judge from written testimony, reversed because without any evidence to sustain it.
5. Married women are not bound by their execution in 1860 of a personal covenant to account and make payments of money for equality of shares.

The opinion states the case.

*Messrs. Norton, Keith & Hollingsworth* and *R. A. Child*, for appellants.

*Messrs. Perry & Perry* and *J. H. Whitner*, contra.

April 17th, 1883.   The opinion of the court was delivered by

Mr. Justice McIver.   Isaac Anderson, having duly made his last will and testament, of which the defendant, William H. Anderson, is the sole qualified executor, departed this life February 17th, 1867, leaving as his heirs-at-law, his widow, who died in May, 1877, and the following named children, to wit: William H. Anderson, James P. Anderson, John F. Anderson, Polly Anderson (who is an imbecile), Huldah Keith, Nancy Stewart, wife of A. Stewart; Hester Nimmons, wife of William Nimmons; Sarah A. Alexander (a widow), and Alpha Barton, wife of O. E. Barton; and the following grandchildren, to wit: M. E. Kirksey and Ellen E. Mauldin (children of a predeceased son),

and the plaintiffs, who are the children of another son, who like-wise predeceased the testator.

In 1859 the testator conveyed, by deed of gift, to his daughter, Mrs. Barton, a tract of land, having previously given to her and most of his other children comparatively small amounts of personal property. On April 10th, 1863, the testator, Isaac Anderson, in consideration of natural love and affection, as well as nominal sums of money, conveyed to several of his children, to wit: John F. Anderson, William H. Anderson, Hester Nimmons, Nancy Stewart and Sarah A. Alexander, respectively, valuable tracts of land, reserving to himself a life-estate therein ; all of whom, except John F. Anderson, who was living in California, went into possession of the tracts conveyed to them, respectively, and have ever since retained possession. On November 9th, 1866, the said Isaac Anderson conveyed to his two granddaughters, the defendants, M. E. Kirksey and Ellen E. Mauldin, a tract of land, of which they took and have ever since retained possession.

On November 10th, 1866, an agreement under seal was signed by certain of these parties, of which the following is a copy :

" Whereas, Isaac Anderson, of the State and district afore-said, on or about the tenth day of April, 1863, for the purpose of advancing his children and making suitable provision for them, did partition and divide certain tracts of land and assign them to some of his said children, and execute and deliver conveyances thereto, reserving, as was then thought, a sufficient amount of property to equalize his children ; and whereas, the unfortunate termination of the recent war has swept away much of the said property, and rendered it almost impossible for justice to be done as the matter now stands, especially as the lands which were conveyed and transferred by him were valued in the then depreciated currency of the country; and whereas, the changed circumstances of the country render a modification of the agreement, then partially entered into, necessary, and, also, another valuation of the said lands ; now, know all men by these presents, that, for and in consideration of the above-mentioned premises, and in order to compromise and arrange, and prevent further misunderstanding and disagreement in the undersigned, children of the said Isaac Anderson, and the husbands of such daughters as are married, have covenanted and agreed to and with each other,

and to and with our father, the said Isaac Anderson, that the lands heretofore conveyed to us, or to each and any of us, shall be revalued by commissioners, appointed for that purpose—the same persons to act as commissioners who acted before, if that be possible—and the true value being thus ascertained to be affixed to the said several tracts of land; and we do further agree, severally, to account for the said valuation of the said lands at the death of the said Isaac Anderson, to his executors or administrators. As it is well known and understood to and among all the parties to this agreement that the said lands are, or have been given by the said Isaac Anderson to his children as advancements, and we further, severally, agree to pay over to the said executors or administrators whatever amount may be found necessary to equalize the children in the settlement of the estate of the said Isaac Anderson after his decease. In witness whereof we have hereunto set our hands and seals, this 10th day of November, A. D. 1866.

(Signed,)      NANCY $\overset{\text{her}}{\times}$ STEWART, [L. s.]
         mark
         HESTER $\overset{\text{her}}{\times}$ NIMMONS, [L. s.]
         mark
         A. STEWART,       [L. s.]
         WM. NIMMONS,     [L. s.]
         SARAH ALEXANDER, [L. s.]
         W. H. ANDERSON,    [L. s.]
         MARY E. ANDERSON, [L. s.]
         ELLEN E. ANDERSON, [L. s.]"

This paper was taken charge of by William H. Anderson, who says in his testimony: "It was the intent that all should sign this paper. I kept this paper after it was executed. Thought I was the proper person to take care of it. Was attending to my father's business. Was not attending to all his business, as a general thing."

On the same day that this paper was signed by the above named parties, Isaac Anderson made his will, the provisions of which need not be stated, further than that they show the desire of the testator to make all his children " equal in the end," and, for this purpose, that each of his children should " render in their advancements." In accordance with the provisions of this paper, the land conveyed to the children and grandchildren who signed the same, as well as the tract conveyed to John F. Ander-

son, were appraised, but no appraisement was made of the land given to Mrs. Barton.

This action was originally commenced by the plaintiffs on February 9th, 1878, (the amended complaint having been served May 7th, 1879,) for the purpose, mainly, of enforcing the performance of the covenants contained in the agreement above set out, by requiring the parties who had received land from the testator to account for the value of the same, as provided for in said agreement, and also for the purpose of obtaining from the executor an account and settlement of the estate, it being alleged in the complaint that the executor had neglected and refused either to account himself or to require the other covenantors to account for the value of the land received by them respectively, because of his own liability so to account, or because of collusion with one or more of his co-covenantors to deprive the other children of the testator, or their representatives, of their right to an equal share of the estate of the testator.

Various defenses were set up by such of the defendants as are appellants, all of which were overruled by the Circuit judge, who rendered judgment in favor of the plaintiffs, by which he directed the appellants to pay certain specific sums of money to the plaintiffs, for the purpose of equalizing the shares of the testator's estate. From this judgment an appeal has been taken upon several grounds, but under the view which we take of the case, it will not be necessary to set out these grounds in detail.

The fundamental and controlling question in the case is, whether the agreement or covenant of November 10th, 1866, was ever fully executed so as to bind the parties who signed to the performance of its terms. We think it clear, not only from the terms of the paper itself, but also from the parol evidence adduced—which was competent for the purpose of showing that the paper was not fully executed, and which not being objected to would be competent for that reason, if for no other—that the intention was that all the children who had received advancements in land should sign the paper and become bound by its terms, and until this was done the transaction was inchoate and incomplete, and no obligation attached to those who did sign,

until all who, according to the understanding of the parties at the time were to sign, had done so.

The cases of *Robertson* v. *Evans*, 3 *S. C.* 330, and *Arthur* v. *Anderson*, 9 *S. C.* 234, cited by the appellants, with the authorities therein referred to, are so perfectly conclusive upon this point that it is wholly unnecessary to add anything upon the subject. In *Robertson* v. *Evans*, the obligation was in form joint and several, and yet that was not allowed to affect the result. So here the fact that by the paper in question the parties covenanted severally to account for the value of the land given to them · respectively, does not take this case out of the rule as settled by those cases. No one of the parties intended to incur any obligation at all, unless all who stood in the same category came into the proposed arrangement. It is assuming the very point in issue to say that the parties who did sign covenanted severally, and therefore it made no difference to them whether others entered into the covenant. The true view is, that there never was any covenant at all, because all who, according to the understanding, were to join did not do so. Where two or more persons agree to enter into a certain covenant as a matter of necessity, one must sign first, and if, after he has signed, the others refuse to do so, his signature amounts to nothing and imposes no obligation upon him.

The scheme, manifestly, was to equalize the shares of all the children, and this could only be affected by all of the children who had received advancements, entering into the proposed covenant, binding themselves each to account for the true value of their respective advancements. But if the terms of the agreement are enforced against those only who signed, the very object which all the parties had in view—equality—would be defeated, and those who did sign would be required to pay more .to those who had received nothing than they would have had to do if the arrangement which the parties understood at the time that they were entering into, had been perfected and not left inchoate and incomplete as it was.

It is true that the terms used in the recital would seem to indicate that the intention was that only those were to sign whose lands were appraised on the day the paper· was signed by some

of the parties, but when we look to the declared object of the whole transaction, and especially when we consider the undisputed parol testimony, it is clear that the intention was that all, including Mrs. Barton, who had received her advancement several years before, should enter into and become bound by the terms of the arrangement. The testimony is direct to the point that the intention was that Mrs. Barton should sign the paper, and that a messenger was sent for her for that purpose. Her testimony does not even tend to show that such was not the understanding with which the other parties signed, but only shows that she was unwilling to enter into the proposed arrangement.

But even if be conceded that it was not in the contemplation of the parties that any should sign except those whose lands were appraised, yet the failure of any one of that class to sign the paper would defeat the whole arrangement, and deprive the instrument of any binding force even as to those who did sign it. Now it is apparent that one of that class, John F. Anderson, never signed the paper, and that alone would be sufficient to destroy the validity of the instrument. It is argued, however, that John F. Anderson being in California at the time could not sign the paper, and therefore it cannot be supposed that it was the intention he should sign. We are not able to appreciate the force of such an argument. There was precisely the same reason for his becoming a party to the arrangement as that any of the others should, and the fact of his absence in these days of rapid and easy communication between distant points, presented but a very small obstacle to his joining in the paper, one which could have been very easily overcome.

It will not do to say, as was argued by respondents, that no land was in fact ever given to John F. Anderson, inasmuch as he was in California at the time, and the deed for his tract was never delivered to him; for it was put upon record, and this would be sufficient evidence of delivery, in the absence of anything to the contrary, except that he was away at the time. But in addition to this it appears from the facts as found by the Circuit judge, that the tract of land conveyed to him was, after his death, partitioned as his property (and not as a part of the

estate of his father, as stated in the argument for respondents) amongst the parties to this case, as his heirs-at-law, and it is now too late for any of them to deny that it was his land.

Again, it is perfectly clear, and, indeed, is conceded, that Mrs. Stewart and Mrs. Nimmons, being married women at the time, under the law as it stood at the date of the paper, their act in signing the instrument in question was an absolute nullity, and amounted to nothing more than if they had not gone through the form of putting their names to the paper. But, it is contended that, after they had acquired all the rights and powers of a *feme sole*, by virtue of the present constitution and the subsequent legislation upon the subject, they have, by their acts, recognized their obligations under the covenant, and must, therefore, be held bound to respond to its terms, and the Circuit judge has so found. After a careful examination of the testimony incorporated in the "Case" we have been unable to discover any evidence whatever that either of these ladies have done any act recognizing the binding force of the covenant, by paying money under it or otherwise.

In the absence of any such testimony it becomes unnecessary to consider whether the act of a *feme covert*, which is absolutely void, can be ratified or confirmed after she becomes discovert, either in fact or in law, or whether any, and if so what, acts done by her would amount to a re-execution of a deed signed by her while under the disability of coverture. There is evidence that Mrs. Alexander, who seems to have been a widow at the time, did subsequently make payments to the executor for the purpose of bringing about equality in the shares of the children, but there is no evidence that she did so in pursuance of the terms of the covenant, and, on the contrary, she says expressly that she did so because she "thought all were bound to pay back without the paper."

We are satisfied that the covenant which constitutes the basis of the plaintiff's case, was never sufficiently executed to become of any legal or binding force, even as to those of the parties who did sign it; and under this view the other questions presented cannot arise, and need not be considered.

The judgment of this court is that the judgment of the Circuit Court be reversed, and that the case be remanded to that court for such further proceedings as may be necessary to carry out the views herein announced.